# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MICHAEL J. CRUTCHFIELD,

     Plaintiff,

                                 Case No. 16-14207

v.

                                 HON. DENISE PAGE HOOD

BEAVER AEROSPACE & DEFENSE
INC., PHILLIPS SERVICE INDUSTRIES,
INC., and AEROTEK AVIATION, LLC,

     Defendants.

_____/

## ORDER DENYING PSI/BEAVER'S MOTION
## FOR SUMMARY JUDGMENT[#33] and GRANTING
## AEROTEK'S MOTION FOR SUMMARY JUDGMENT [#34]

## I.      INTRODUCTION

On November 30, 2016, Plaintiff Michael J. Crutchfield filed the instant action

alleging that Defendants discriminated against him on the basis of his age and

disability when Defendant Beaver Aerospace & Defense, Inc. ("Beaver") did not

directly hire him after a period of contract work.  On December 21, 2017, Defendants

Phillips Service Industries, Inc. ("Phillips") and Beaver (collectively, "PSI/Beaver")

filed a Motion for Summary Judgment [Dkt. No. 33] and Defendant Aerotek Aviation,

LLC ("Aerotek") filed a separate Motion for Summary Judgment. [Dkt. No. 34]  Both

motions have been fully briefed, and a hearing was held on February 7, 2018.  For the

reasons that follow, the Court denies PSI/Beaver's Motion for Summary Judgment and grants Aerotek's Motion for Summary Judgment.

## II.    STATEMENT OF FACTS

In March 2015, Plaintiff was 65 years old. Plaintiff holds BBA and MBA degrees, and he served in the U.S. Coast Guard, where he was trained and worked as an Aviation Electronics Technician. He also was employed in engineering, avionics, and quality positions with General Motors, General Atomics, TacAir, and WAAM radio. Plaintiff had over 20 years of electro-mechanical repair experience, including repair, disassembly and reassembly of actuators. As a result of his Coast Guard service, which included working around jet engines and being a radioman on an aircraft, Plaintiff has bilateral hearing loss, for which he wears hearing aids, and tinnitus (a constant ringing in the ears), for which he receives VA disability benefits.

Aerotek is a staffing company that provides its clients with technical, professional, and industrial recruiting and staffing services, and it assigns temporary employees to work on clients' premises. Beaver, an aerospace contractor, designs and manufactures ball screws, aircraft actuators, and other electromechanical actuation systems, and its actuators are used to control aircraft components like flaps, critical to an aircraft's operation. Beaver is a wholly-owned subsidiary of PSI.

Plaintiff was hired by Aerotek and placed to work at Beaver as an actuator

2

assembler in March 2015. In the six months preceding Plaintiff's placement at Beaver, six other persons hired by Aerotek were placed at Beaver as assemblers, and each of those persons was in his 20s or 30s. Their respective positions, as set forth in the preamble of their respective employment agreements were: Technician (Plaintiff), Assembler (1 person), Actuator Assembly (4 persons), and Test Technician (1 person). PSI/Beaver's website posted the required qualifications for the assembler positions, which included "high school diploma" and "5 years assembly experience," and gave an overview of the position as "The Assembler constructs, assembles, or rebuilds mechanical assemblies and equipment." According to Plaintiff, he and the other Aerotek assemblers were repeatedly assured by Aerotek recruiter Alex Switzer (who contacted Plaintiff about the position), Beaver General Manager Ben Kearns, and Beaver Quality Manager Kelly Ryan that the assemblers would be direct-hired by Beaver after six months. Plaintiff was the only one of the seven Aerotek assemblers who was not direct-hired (or chosen to be direct-hired) by Beaver.

All of the Aerotek assemblers worked in the same department and room at Beaver. There were mechanical benches and electrical work benches, and all of the Aerotek assemblers were required to be familiar with both electrical and mechanical assembly and tested on both areas. At least Plaintiff, Lancaster, and Nyeste performed both electrical and mechanical work. Two weeks into the job, Plainitff was rated as

"meets" or "exceeds" in every category, with an overall rating of "exceeds," and his rating was better than four of the other Aerotek assemblers (Hunt, Lancaster, JS, Schneider), all of whom were reviewed as "actuator" or "actuator assembly." Kearns testified that Plaintiff "did a good job."

In June 2015, Ryan told the Aerotek assemblers that they all were doing a great job and would be direct hired "if the workload permit[ted]." Kearns subsequently reiterated that they would all be hired, but Plaintiff was unable to hear what Kearns said and asked what was going to happen with the Aerotek assemblers. Kearns responded, "What's the matter? Weren't you listening? I already talked about that. Yes, you guys are getting hired." In August 2015, Beaver's assembly area was busy and a second shift was added. Plaintiff complained to Ryan that rock music blasting in the assembly room was problematic and discussed his hearing loss with him. Eventually, Plaintiff complained to Beaver Quality Inspector Ray Gilman about the noise. The music was turned down for a week, but then resumed.

On September 5, 2015, five of the other seven Aerotek assemblers were direct hired by Beaver, three of whom were rated lower than Plaintiff. Several weeks later, Beaver brought in Joe Bolstrum, who was about 20 years younger than Plaintiff, to perform electrical assembly work. Bolstrum was a long-time, regular employee of PSI and its affiliates (including Beaver), with years of electrical experience. In the fall of

2015, Bolstrum was transferred to Beaver as an "assembler," spending 70% of his time on electrical assembly work and 30% on residual Power Thru work. Beaver acknowledges that Bolstrum was taken from Power Thru to replace Plaintiff and did so in January 2016. Plaintiff consistently worked overtime, up to late January 2016, usually assembling actuators, while performing other isolated projects including "Lean" initiatives and 5S work. In early 2016, Plaintiff's relationship with Beaver was terminated, Beaver states, because the "temporary electronic assembly work" he was doing had been exhausted.

Plaintiff testified that Beaver Quality Director Dave Rulla, a 40-year employee at Beaver, stated to Plaintiff in January 2016, "You should just retire and let a younger person have your job." Plaintiff testified that shortly after Rulla made that comment, Rulla assigned Plaintiff to clean and organize the cage, "a filthy, long neglected area of the shop covered in oil residue, and would not allow Plaintiff to be assisted by other workers.

On February 2, 2016, Rulla offered a direct hire position to the last Aerotek assembler (other than Plaintiff) brought on in late 2013/early 2015 (assembler JS). On February 3, 2016, Plaintiff sent Rulla an email indicating that Plaintiff would "like to meet with [Rulla] to discuss [Plaintiff's] future at psi/Beaver," and indicating his continued desire to be a direct employee. Rulla did not respond to the email, nor did

Beaver offer Plaintiff the position when JS failed his drug test. On or before February 5, 2016, Rulla communicated to Aerotek agent Matthieu Moss that Beaver wanted Plaintiff released. On February 5, 2016, Moss called Plaintiff to advise Plaintiff that his services were no longer needed at Beaver and that Plaintiff was being let go for "economic reasons." Kearns was a decision-maker with respect to terminating Plaintiff's relationship with Beaver. Kearns testified that the decision had nothing to do with Plaintiff's performance.

At the time of Plaintiff's termination, Beaver continued to post that it was hiring for assembler positions, and no one at Beaver (or Aerotek) told Plaintiff that there was no assembler work (electrical and/or mechanical) available at Beaver. Ryan testified that there was a lot of work for Honda because Honda was busy and that there was electrical work to do. Shortly after Plaintiff's release, Bolstrum's title was changed from "assembler" to "Electronics Technician." Less than two weeks after Plaintiff's release, Lancaster was promoted to an inspection job, creating a vacancy. Lancaster's assembler postion was filled by Ken Finney, who was in his 30s, in early May, 2016.

## III. APPLICABLE LAW

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## IV.    ANALYSIS

### A.    PSI/Beaver's Motion for Summary Judgment

*1.      Age Discrimination*

With respect to the ADEA and ELCRA claims based on age discrimination,[1] a plaintiff must establish that: (1) he was a member of a protected class (over 40 years old); (2) he was subject to an adverse employment decision; (3) he was qualified for the position he held; and (4) that he was replaced by someone of a different class (under 40 years old), or treated differently than persons in a different class (under 40 years old), such that it supports an inference of discrimination. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523-28 (6th Cir. 2008); *Tuttle v. Metro. Govt. of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007).  *See also Birch v. Cuyahoga Cty. Probate Court*, 392 F.3d 151, 166 n.12 (6th Cir. 2004) (in a failure to hire case, a plaintiff establishes a prima facie case by showing: (a) he belongs to a protected class; (b) he applied for

---

[1]Claims of age discrimination brought pursuant to ELCRA are analyzed under the same evidentiary framework as similar claims brought under the ADEA. *Geiger*, 579 F.3d at 626 (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007)).  There is one important distinction with respect to causation, because "[i]n contrast to the ADEA's 'but-for' causation burden, under the ELCRA, a plaintiff must ultimately prove that the defendant's discriminatory animus was a 'substantial' or 'motivating' factor in the decision." *Provenzo v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011) (citing *Sniecinski v. BCBS of Mich.*, 469 Mich. 124 (2003)). *See also Hazle v. Ford Motor Co.*, 464 Mich. 456, 466 (2001) (citing Michigan Civil Jury Instruction 105.02 ("The plaintiff must prove that he was discriminated against because of [age] . . . [age] does not have to be the only reason, or even the main reason, but it does have to be one of the reasons which made a difference")).  Plaintiffs' ADEA and ELCRA age discrimination claims will be analyzed together.

and was qualified for a job which the employer was seeking applicants; (c) despite his qualifications, he was rejected; and (d) after his rejection, the position remained open and the employer continued to seek applications from persons of the prospective employee's qualifications and/or that a person outside of his protected class was hired).

If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action against the plaintiff. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6t h Cir. 2003); *McDonnell Douglas*, 411 U.S. 792, 805 (1973). Once the defendant offers a legitimate, non-discriminatory reason for its conduct, the burden shifts back to the plaintiff to demonstrate that the defendant's stated basis for the adverse employment action is a pretext designed to mask discrimination. *Texas Dept. Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas*, 411 U.S. at 805.

A plaintiff can establish pretext by producing evidence sufficient for a jury to reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against the plaintiff. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) ("A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct"). *See also Harris*

*v. Metro. Govt. of Nashville and Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010); *Dubey v. Stroh Brewery Co.*, 185 Mich.App. 561, 565-66 (1990). A plaintiff must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Harris*, 594 F.3d at 486. A plaintiff cannot establish a *prima face* case of discrimination based on vague, ambiguous or isolated remarks. *Hein v. All America Plywood Co., Inc.*, 232 F.3d 482, 488 (6th Cir. 2000) (citation omitted).

"The *McDonnell Douglas* framework can still be used to analyze ADEA claims based on circumstantial evidence," *Geiger*, 579 F.3d at 622-23, but not in cases where the ADEA claim is based on direct evidence. For ADEA claims based on direct evidence of age discrimination, the Supreme Court has enunciated "the correct standard for ADEA claims as whether the plaintiff has proven 'by a preponderance of the evidence ... that age was the "but-for" cause of the challenged employer decision,'" such that the "burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Geiger*, 579 F.3d at 621 (citing *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 2351-52 (2009)).

In this case, PSI/Beaver does not dispute the first three elements are satisfied

for Plaintiff's age discrimination claims, as he: (a) is a member of a protected class (an employee who was at least 40 years old); (b) was subject to an adverse action when he was terminated and not directly hired; and (c) was qualified for the position he held, as it is undisputed that he performed assembler tasks for more than 10 months before his termination and Beaver's representatives have testified that he did good work and was not let go for performance reasons.

Plaintiff contends, and the Court agrees, that there is direct evidence of age discrimination. Rulla's statement to Plaintiff that Plaintiff "should retire and let a younger person have your job," made in close proximity to the decision to release Plaintiff (a decision in which Rulla participated), could constitute direct evidence of age discrimination by Beaver. *See Debrow v. Century 21 Great Lakes, Inc.*, 463 Mich. 534, 540 (2001) (statement of employee's superior telling employee that he was "getting to old for this shit" was direct evidence of unlawful age discrimination); *Brewer v. New Era, Inc.*, 564 F. App'x 834, 839 (6th Cir. 2014) (although he "was not closely involved in the selection of employees to lay off even though he authorized the layoffs during the reduction in force," statements by owner of company's son two months before plaintiffs were terminated "that they were 'too old' and 'needed to retire' could arguably constitute direct evidence of age discrimination by" company). Based on Rulla's statement, the Court finds that there is a genuine dispute of material

fact whether Beaver discriminated against Plaintiff because of his age.

Plaintiff argues, and the Court finds, that there also is circumstantial evidence that Plaintiff's age was a factor in Beaver's decision not to directly hire him. Such evidence includes: (1) Rulla's comments that Plaintiff should retire; (2) Plaintiff was the only one of the seven assemblers who was not direct-hired and all of the other assemblers who were under 40 were direct-hired; (3) the hiring of Bolstrum to perform electrical assembly work; (4) continuing to post for persons to perform the work Plaintiff was doing despite Beaver finding that Plaintiff did good work; and (5) not hiring Plaintiff when JS failed his drug test, leaving open a direct-hire assembler vacancy.

Beaver suggests that they did not know how old Plaintiff was. As Plaintiff was basically 30 years older than any of the other Aerotek assemblers, it seems reasonable to assume that it was evident to Beaver personnel that Plaintiff was over 40 and that there was a significant differential in age between Plaintiff and the other Aerotek assemblers.

Beaver asserts that the persons it hired to work its mechanical assembly positions were the Aerotek assemblers who had been performing that work for many months as contract employees. Beaver states that Plaintiff worked as an electrical assembler, which was a different position from the mechanical assembly positions that

he did not perform. Beaver contends that Plaintiff "was an electronics technician and . . . lacked experience in the mechanical assembly work done at Beaver," and for that reason, Plaintiff was not direct-hired for the mechanical assembly positions. Beaver notes that the position Plaintiff was hired to fill on a contract basis was "Electronic Technician," as set forth on the personnel requisition form Beaver utilized.

Beaver indicates that Plaintiff's scores on the mechanical assembly areas of the skills matrix were uniformly poor, and Ryan "scored Plaintiff '0' on 16 distinct categories of work, including every category involving mechanical assembly." Beaver also relies on Plaintiff's testimony (Plaintiff states that he was joking) that there was no reason for him to offer to help mechanical assemblers during slow periods because for his "first six months there, [he] was . . . still learning where the bathroom was. So I really couldn't help them a whole lot, but I did as much as I could." Finally, Beaver indicates that Bolstrum, who had been a long-time PSI/Beaver employee and had been reassigned to Beaver in the fall of 2015, performed as an Electronic Technician and, as such, performed the electrical assembly work, eliminating the need to direct hire Plaintiff. The Court finds that Beaver has offered a legitimate, non-discriminatory basis for not direct-hiring Plaintiff.

Plaintiff asserts that there is ample evidence that Beaver's reason for not direct-hiring him was pretextual. Plaintiff states that Beaver has offered different reasons

for its decision to lay-off Plaintiff: (a) lack of electrical work, and (b) that Plaintiff lacked the qualifications for mechanical assembly. As noted above, there is evidence that there was electrical work available at Beaver at the time Plaintiff was released, as Bolstrum was hired to do electrical work and became the "Electronics Technician" just days after Plaintiff's release. There is no evidence that Plaintiff was advised that there was no electrical work or that he lacked qualifications for the mechanical or electrical assembly positions. As to the mechanical assembly areas of the skills matrix on which Plaintiff got poor scores, Plaintiff maintains that his low scores were because he did not perform the tasks related to those scores. Plaintiff argues that his ratings in those areas were blank circles, something that Beaver does not dispute. Beaver states that a blank circle on the Job Skills Matrix is the lowest rating, but that a blank circle for a particular skills category means "no knowledge/not performed." The Court finds that Plaintiff has presented adequate evidence that Defendant's asserted reason(s) were pretext for age discrimination.

For the reasons set forth above, the Court denies PSI/Beaver's Motion for Summary Judgment with respect to Plaintiff's age discrimination claims.

2.    *Disability Claims*

To establish a prima facie case under the PWDCRA/ADA, a plaintiff must show that (1) he is "disabled"; (2) he was qualified for the position without or without

accommodation; (3) he suffered an adverse action; (4) that the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open, the individual was replaced by a similarly-situated, non-disabled employee, or similarly-situated, non-disabled persons were treated more favorably than he was. *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2001); *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1246 (6th Cir. 1995).  Beaver claims that Plaintiff cannot establish causation. *Lewis v. Humboldt Acquis. Corp.*, 681 F.3d 312, 321 (6th Cir. 2012)(*en banc*).

The entirety of Plaintiff's argument is:

> Plaintiff wears adaptive devices (hearing aids) for his disabilities; they are readily apparent.  In addition, Plaintiff specifically disclosed and discussed his hearing disabilities with Defendant's agents, and requested that he not be subjected to loud music in the workplace.  Defendant Beaver responded to Plaintiff's concerns with hostility and/or indifference, refusing to act.  Given Defendant's overt hostility toward Plaintiff's hearing loss and disabilities, a jury could easily conclude that his Plaintiff's age and disability claims are intertwined – that Defendant viewed Plaintiff as an older, hard of hearing, and thus less desirable candidate for being direct hired.  At a very minimum, a question of fact exists as to whether Plaintiff's disabilities were a factor in Defendant's failure to direct-hire him.

[Dkt. No. 38, PgID 694]

Beaver did not respond to Plaintiff's disability argument in its reply brief. Except for the comment by Kearns about Plaintiff "not listening" not being evidence of disability bias, the Court isnot be persuaded by the arguments Beaver makes in its brief in support of its Motion for Summary Judgment.  Beaver's suggestion that

15

Kearns did not know of Plaintiff's hearing issues is, at best, a genuine dispute of material fact because Plaintiff: (a) wore "readily apparent" hearing aids; (b) claims he discussed his hearing disabilities with Beaver agents, and (c) asked that loud music not be played in the workplace.

The rest of Beaver's arguments parallel those made with respect to Plaintiff's age discrimination claims and are rejected for the same reasons. Beaver argues that Plaintiff cannot show that similarly-situated, non-disabled persons were treated more favorably than he was. Beaver claims the persons who filled the mechanical assembler positions were already performing that type of work and "thus were objectively more qualified than Plaintiff for those positions, and therefore not similarly situated to him." Beaver asserts that Plaintiff was not qualified for those positions, nor the position originally awarded to JS (a position Beaver states was never filled).

Although a much closer call than the age discrimination claim, the Court denies Beaver's Motion for Summary Judgment on Plaintiff's disability claims.

**B.      Aerotek's Motion for Summary Judgment**

*1.      Age Discrimination*

It is undisputed that Aerotek was Plaintiff's employer, but it is also undisputed that PSI/Beaver made all decisions relative to Plaintiff's relationship with PSI/Beaver.

Specifically: (a) Beaver's General Manager interviewed him and advised Aerotek that it wanted Plaintiff to perform contract work for Beaver; (b) Beaver personnel determined the position(s) to which Plaintiff was assigned and the duties he performed at Beaver; and (c) Beaver personnel advised Aerotek on or about February 3, 2016 that it would no longer need Plaintiff's services (or the services of two other Aerotek contract employees) because Beaver did not have sufficient work. It is undisputed that Aerotek and its employees were not involved in any of those decisions.

It also is undisputed that: (1) Aerotek employees were in regular contact with Plaintiff regarding his position at Beaver; (2) Plaintiff never communicated to anyone at Aerotek – before or after he was released by Beaver – that Plaintiff had been subjected to discriminatory treatment based on Plaintiff's age or disability; (3) Plaintiff never communicated to anyone at Aerotek what Rulla had said to Plaintiff about retirement and letting a younger person have his job; and (4) Plaintiff was the last of the seven persons identified by Plaintiff (including himself) that Beaver selected to perform in Actuator Assembly.

Aerotek first asserts that Plaintiff has no evidence that Aerotek took any adverse discriminatory employment actions against him. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (requiring "a significant change in employment status . . ."); *EEOC v. Olver Inc.*, 2006 WL 2076764, at *2 (W.D. Va. July 24, 2006)

(holding that there was no evidence that employer-staffing agency took an adverse action against plaintiff when its client decided to terminate plaintiff's assignment where plaintiff had no reason to believe that anyone at staffing agency played a role in her termination, no one at the staffing agency ever said or did anything discriminatory to plaintiff, and staffing agency did not share control over employees it placed at client).

It is undisputed that no one associated with Aerotek made any alleged discriminatory comments to, or engaged in any alleged discriminatory conduct toward, Plaintiff. There is no evidence that anyone at Aerotek was even aware of such comments, nor is there evidence that anyone associated with Aerotek was involved in any decisions regarding who to hire or lay off at Beaver. Plaintiff relationship with Aerotek did not end when his contract period with Beaver terminated, Aerotek did not take any action to terminate its relationship with Plaintiff. and he continued to use Aerotek to obtain employment. There is no evidence that anyone at Aerotek discriminated against Plaintiff during the course of the time Plaintiff worked for Beaver.

Aerotek also argues that this is a reduction in force case, which requires that "the evidence must be sufficiently probative to allow a factfinder to believe that his employer intentionally discriminated against the plaintiff because of age." *Mayhue v.*

*Cherry Street Servs., Inc.*, 598 F. App'x 392, 401-02 (6t h Cir. 2015).  Aerotek argues

that Beaver did not hire anyone to replace Plaintiff, but that is a question of fact, as

discussed above (*e.g.*, Bolstrum's hiring).

Aerotek also asserts that Plaintiff is not disabled under applicable laws because

his bilateral hearing loss is 0% and his bilateral tinnitus is 10% (according to summary

of benefits obtained from the Department of Veteran Affairs).  Aerotek contends that

there is no evidence that anyone at Aerotek with whom Plaintiff interacted knew that

he was disabled, but Plaintiff wore hearing aids and he also sought – and obtained –

from Aerotek on February 5, 2016 (before Plaintiff was told he was being laid off)

confirmation that he was a disabled vet. [Dkt. No. 39, Ex. 1]

Plaintiff claims that Aerotek knew or should have known that he was being

denied a direct hire position based on his age when all the younger assemblers were

directly-hired but he was not.  But, Aerotek argues that Plaintiff was the last one hired,

so it made sense that he would be the last one directly-hired (as well as the fact that

he was the only one hired as an electronics technician rather than for mechanical

assembly).

Plaintiff suggests that a jury could conclude that Rulla told Matthieu Moss at

Aerotek that it was time for Plaintiff to retire to make room for someone younger –

but there is no evidence of that.  The only evidence related to what Rulla may have

told Moss upon the termination of Plaintiff's relationship with Beaver is an email by Moss that indicates that Moss was contacted by Beaver and told to lay off three persons (including Plaintiff) for lack of need.

Plaintiff argues that Aerotek was an agent of Beaver and seems to suggest that Aerotek is responsible for acts of Beaver. Plaintiff's reliance on a Fifth Circuit case is misplaced. In *Burton v. Freescale Semiconductor, Inc., Manpower*, 798 F.3d 222 (5th Cir. 2015), the court held that a staffing agency could be liable for the plaintiff's termination by its client "if it participates in the client's discrimination. For example, if the firm honors its client's request to remove a worker from a job assignment <u>for a discriminatory reason and replace him with an individual outside the worker's protected class, the firm is liable for the discriminatory discharge. The firm also is liable if it knew or should have known about the client's discrimination and failed to undertake prompt corrective measures within its control.</u> *Id.* at 228 (emphasis added). Here, there is no evidence Aerotek knew or should have known about the alleged discrimination against Plaintiff.

Plaintiff argues that Aerotek is liable under a "cat's paw" theory, but Plaintiff misapplies the theory. Under the cat's paw theory, discriminatory animus may be imputed to the titular decision-maker, even where the person is a mere conduit for the actual discriminator's animus. *See, e.g., EEOC v. New Breed Logistics*, 783 F.3d

1057, 1069 (6th Cir. 2015). For the cat's paw theory to apply in this case, there would have to be evidence that Aerotek was the driving force behind the employment action (Plaintiff's termination at Beaver) and that Beaver simply made the decision at Aerotek's directive, without evaluating Plaintiff's situation. But, there is no evidence that Aerotek: (1) made the decision to terminate Plaintiff's relationship with Beaver; or (2) was the driving force that dictated to Beaver that Plaintiff should be terminated.

## V. CONCLUSION

Accordingly,

IT IS ORDERED that PSI/Beaver's Motion for Summary Judgment [Dkt. No. 33] is **DENIED**.

IT IS FURTHER ORDERED that Aerotek's Motion for Summary Judgment [Dkt. No. 34] is **GRANTED**.

IT IS ORDERED.

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated: August 30, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 30, 2018, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager